UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JOE L. RODRIGUEZ,

       Plaintiff,

  v.                                    Case No. 20-cv-1236-JPG

F. AHMED,

       Defendant.

## MEMORANDUM AND ORDER

This matter comes before the Court on the motion for summary judgment filed by defendant Dr. Faisal Ahmed (Doc. 60). Plaintiff Joe L. Rodriguez has responded to the motion (Doc. 62), and Dr. Ahmed has replied to that response (Doc. 65).

Rodriguez filed this civil rights action *pro se* pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 397 (1971), complaining of the medical care he received in 2020 and 2021 while he was an inmate at the Federal Correctional Institute at Greenville, Illinois ("FCI-Greenville"). Rodriguez claims that Dr. Ahmed, the Clinical Director at FCI-Greeneville, denied him adequate medical treatment for his scalp condition (seborrheic dermatitis), back injury, hernia, type 2 diabetes ("T2D"), and elevated liver enzymes in violation of his Eighth Amendment rights. He seeks monetary and injunctive relief.

The Court will grant summary judgment for Dr. Ahmed because the evidence shows that, even though he made a highly unprofessional comment to Rodriguez, he provided adequate medical care within the range of accepted professional judgment, adjusted or changed medications if they were insufficiently effective, referred Rodriguez to an outside specialist when he was stumped, and followed up on a red flag that could have signified a larger problem.

I.  **Summary Judgment Standard**

Summary judgment is appropriate only if the moving party can show "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the burden of establishing that no material facts are genuinely disputed. *Lawrence v. Kenosha Cty.*, 391 F.3d 837, 841 (7th Cir. 2004). Any doubt about the existence of a genuine issue must be resolved in favor of the nonmoving party. *Id.*

When presented with a motion for summary judgment, the Court does not decide the truth of the matters presented, and it cannot "choose between competing inferences or balance the relative weight of conflicting evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Hansen v. Fincantieri Marine Grp.*, 763 F.3d 832, 836 (7th Cir. 2014).

Once a properly supported motion for summary judgment is filed, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (internal quotations omitted). The Court must then "view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen*, 763 F.3d at 836 (internal quotations omitted). If the "evidence is such that a reasonable jury could return a verdict for the nonmoving party[,]" then a genuine dispute of material fact exists. *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (internal quotations omitted).

II.  **Relevant Facts**

Viewing the evidence and drawing all reasonable inferences in favor of Rodriguez, the evidence in the file establishes the following relevant facts for the purposes of this motion.

Rodriguez was convicted of a federal crime in May 2019 and was sentenced to serve 144

months in prison. The Bureau of Prisons ("BOP") assigned him to start serving his sentence at FCI-Greenville. He arrived there on October 21, 2019, and remained there until he was transferred to another institution on July 15, 2021. This lawsuit concerns the medical treatment Rodriguez received at FCI-Greenville during that time, when Dr. Ahmed was the Clinical Director of the healthcare unit for the prison.

    A.    <u>Rodriguez's Health</u>

On the day he arrived at FCI-Greenville, Rodriguez met with physician's assistant ("PA") Schneider for an intake appointment. With respect to his medical conditions, Rodriguez told PA Schneider the following:

- <u>Diabetes</u>: Before his incarceration he had controlled his T2D with two different oral medications (Metformin and Invokana/canagliflozin), and he had started insulin injections (Lantus) while he was on pretrial detention in county jails. On his intake form, he indicated he did not need to take insulin injections and only wanted pills to control his T2D as he had done before his arrest;

- <u>Back injury</u>: He took muscle relaxers (Flexeril) for back pain and spasms from a 2008 truck accident, and he already had a two-week prescription when he arrived at the prison; and

- <u>Scalp condition</u>: He had been suffering from scalp problems (seborrheic dermatitis) since before his arrest. In the past, a dermatologist had given him a steroid injection to treat it.

PA Schneider developed a treatment plan that substituted Tylenol for Flexeril and that included blood pressure medication for hypertension, Metformin and insulin for T2D, and an anti-fungal shampoo for the scalp condition. Dr. Ahmed approved Rodriguez's participation in the Chronic Care Clinic and PA Schneider's treatment plan.

Two days later, on October 23, 2019, Rodriguez saw PA Mills, who found that Rodriguez did not have a hernia as he had been earlier advised by a jail medical provider, was obese, and had a full range of motion in his spine. PA Mills also prescribed an anti-fungal solution for

3

Rodriguez's scalp, and ordered lab tests and an appointment with an eye doctor. Dr. Ahmed reviewed and approved PA Mills's decisions. One of the tests ordered revealed elevated liver enzymes.

The lab tests also revealed that Rodriguez's blood glucose level and his A1c level (a measure of glucose control over the prior two- to three-month period) were high. To help manage his diabetes, at Dr. Ahmed's direction, twice a day medical staff tested Rodrigues's blood glucose level and administered insulin injections. On one occasion, Rodriguez received an additional insulin injection at Dr. Ahmed's direction to treat a high blood glucose incident. In December 2019, Rodriguez was issued a blood glucose testing monitor that he could keep with him and use any time. A nurse also reviewed his diet with him and advised him that additional lifestyle counseling (*e.g.*, regarding diet and physical activity) was available to him.

FCI-Greenville medical staff continued to monitor and treat Rodriguez's various health problems, including various treatments for his scalp condition.

B. Dr. Ahmed's Direct Care

*Chronic Care Clinic on February 18, 2020*

Rodriguez had his first visit to the Chronic Care Clinic with Dr. Ahmed on February 18, 2020. Rodriguez had gained weight since he arrived at FCI-Greenville and was still obese. He asked Dr. Ahmed to prescribe Invokana, which he had taken before his arrest, but Dr. Ahmed refused. Generally, in his selection of medications to treat diabetes, Dr. Ahmed considered an inmate's A1c level and his dietary and medication compliance. In Dr. Ahmed's opinion and in his experience, no medication would work if a patient does not control his diet. He found, based on Rodriguez's commissary purchases (many high-fat, high-salt, low-nutrient items) and weight gain, that Rodriguez was not compliant with dietary recommendations for people with T2D. In

4

his judgment, insulin was a better choice for non-compliant patients because it could be more easily adjusted based on daily carbohydrate intake. In fact, Rodriguez did not consume all of the food he purchased at the commissary but gave it to or traded it with other inmates, which he pointed out to Dr. Ahmed at the time.

Additionally, Invokana was not on the BOP's drug formulary, so Dr. Ahmed was not allowed to prescribe it until an inmate had been unsuccessful on other formulary medication while complying with dietary recommendations, which Rodriguez had not been. Indeed, Dr. Ahmed had prescribed Invokana and other non-formulary drugs to other inmates who exercised reasonable control to limit their carbohydrate intake. In any case, Dr. Ahmed would not have selected Invokana for Rodriguez anyway because of its potential side-effects. In the end, Dr. Ahmed added an additional T2D medication to Rodriguez's treatment plan (glipizide) and continued the orders for insulin and Metformin.

As for Rodriguez's seborrheic dermatitis, Dr. Ahmed prescribed special shampoo and a new steroidal lotion when Rodriguez complained that the treatments he was using (anti-fungals) were not working. Dr. Ahmed declined to give a steroid injection because it was not the primary treatment for the condition and because it posed a risk of infection, especially to someone with uncontrolled T2D like Rodriguez.

Dr. Ahmed also refused to prescribe Flexeril for Rodriguez's back pain and continued the order for Tylenol. Again, Flexeril was a non-formulary drug, and in his opinion Rodriguez did not need it. Also, inmates were known to sell it within the prison, and inmates could become addicted to it and abuse it. The BOP only permitted the use of such muscle relaxers—or sedative hypnotics, as Dr. Ahmed refers to them—on a short term basis after an inmate has had extensive orthopedic surgery or for other specific chronic conditions that Rodriguez did not have.

At the Chronic Care Clinic visit, Rodriguez also told Dr. Ahmed he had been diagnosed with a hernia in the past which bothered him at night, and he asked for surgery. Dr. Ahmed examined the area of Rodriguez's complaint and determined it was not a hernia but a diastasis rectus.[1] Dr. Ahmed told Rodriguez it did not require surgery and could be alleviated by simple exercise, but he did not explicitly tell Rodriguez it was not a hernia. He told Rodriguez he would not operate because he was not going to spend any more of the taxpayers' money on him. Dr. Ahmed thought it appropriate for observation and monitoring, for which Rodriguez could visit the prison's healthcare unit.

In the same visit, Dr. Ahmed informed Rodriguez that some of his blood test results indicated elevated liver enzymes, which were consistent with fatty liver.[2] Dr. Ahmed ordered an ultrasound to investigate further and confirmed Rodriguez had fatty liver that had not yet progressed to cirrhosis. He advised Rodriguez to modify his lifestyle to lose weight, the only treatment known for avoiding the progression to cirrhosis.

Dr. Ahmed also told Rodriguez that he would not give him the treatments Rodriguez wanted but only what the doctor himself wanted. He advised Rodriguez that one way to get rid of his problems was to hang himself in his cell.

Following Rodriguez's first visit to Dr. Ahmed at the Chronic Care Clinic, FCI-Greenville medical staff continued to treat Rodriguez's conditions. Several times, PA Mills

---

[1] "'Diastasis recti' means your belly sticks out because the space between your left and right belly muscles has widened. You might call it a 'pooch.'" WebMD, Abdominal Separation (Diastasis Recti), https://www.webmd.com/baby/guide/abdominal-separation-diastasis-recti (visited May 5, 2023). A medical provider at another BOP facility later confirmed this diagnosis.

[2] "Fatty liver disease (steatosis) is a common condition caused by having too much fat build up in your liver." Cleveland Clinic, Fatty Liver Disease, https://my.clevelandclinic.org/health/diseases/15831-fatty-liver-disease (visited May 5, 2023).

increased his insulin dosage because his blood glucose was elevated.  An ultrasound of Rodriguez liver was also performed on April 17, 2020.

*Doctor's Appointment on June 10, 2020*

Rodriguez saw Dr. Ahmed next on June 10, 2020.  At that visit, Dr. Ahmed reviewed the April 17, 2020, liver ultrasound with him.  The ultrasound showed non-inflamed gallstones and no mass lesions on his liver.  Rodriguez had gained weight since his Chronic Care Clinic visit, so Dr. Ahmed counseled him again on the connection between poor diet and many of Rodriguez's health problems.

Again, after this visit, FCI-Greenville medical staff continued to treat Rodriguez's previously identified conditions, including adjusting his insulin dosage as well as diagnosing and treating other emerging problems.

*Chronic Care Clinic on March 22, 2021*

Rodriguez saw Dr. Ahmed next on March 22, 2021, and they discussed diabetes and blood sugar control.  Dr. Ahmed increased Rodriguez's oral diabetes medication (glipizide) and again counseled him on his increased weight, on his commissary choices, and to stop eating high-sugar junk food.  With respect to Rodriguez's scalp, Dr. Ahmed changed the prescription shampoo to a coal tar shampoo and ordered a different topical steroidal cream which he thought would reduce the itch and avoid potentially damaging scratching.  Dr. Ahmed ordered a hand x-ray and a back x-ray when Rodriguez complained of pain.  The hand x-ray showed minimal osteoarthritic changes but was otherwise unremarkable.  The back x-ray was unremarkable as well.

*Doctor's Appointment on May 4, 2021*

When Rodriguez saw Dr. Ahmed next on May 4, 2021, he asked Dr. Ahmed to change

his scalp medication, which Dr. Ahmed did.

*Doctor's Appointment on May 25, 2021*

On May 25, 2021, Rodriguez saw Dr. Ahmed for his scalp and blood sugar levels. Dr. Ahmed increased his insulin dosage and told him he would refer him to a dermatologist for his scalp problem. An appointment was not available until October 2021 in part due to difficulty getting appointments during the COVID-19 pandemic. Dr. Ahmed discontinued the scalp medication Rodriquez was using at his request. Before Rodriguez was able to see the dermatologist, he was transferred to another BOP facility in July 2021 where Dr. Ahmed was not his doctor.

During his entire stay at FCI-Greenville, Rodriguez was able to accomplish activities of daily living, including working at a UNICOR job. He never had a diabetes-related seizure and was never hospitalized.

**III.      Discussion**

   A.      Legal Standard

Rodriguez's claim is governed by the Eighth Amendment deliberate indifference standard. The Eighth Amendment prohibits the infliction of cruel and unusual punishment. The test for an Eighth Amendment violation due to conditions of confinement, including medical care, has two components, an objective and a subjective one. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *see Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

First, the condition of confinement about which the inmate complains must be objectively serious. *Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337,347 (1981)). An objectively serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity

8

for a doctor's attention." *Johnson v. Snyder*, 444 F.3d 579, 584-85 (7th Cir. 2006) (quotations omitted).  A serious medical condition need not be life-threatening to be serious.  *Diaz v. Godinez*, 693 F. App'x 440, 443 (7th Cir. 2017) (citing *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012)).

Second, the official must have a sufficiently culpable state of mind, that is, he must at a minimum be deliberately indifferent.  *Farmer*, 511 U.S. at 834.  Deliberate indifference requires more than mere negligence.  *Petties*, 836 F.3d at 728 (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).  An official is deliberately indifferent if he "knows of and disregards an excessive risk to inmate health or safety."  *Farmer*, 511 U.S. at 837; *accord Johnson*, 444 F.3d at 585 ("The standard requires that an officer have 'subjective awareness' of the serious medical need and then act with indifference to that need.").  A plaintiff need not show that his serious medical needs were literally ignored; it may be enough to show that the defendant's response was "so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs."  *Haywood v. Hathaway*, 842 F.3d 1026, 1031 (7th Cir. 2016) (internal quotations omitted).  Indeed, deliberate indifference may be found where a treatment decision was blatantly inappropriate or such a significant departure form accepted professional judgment that it calls into doubt whether the decision was even an exercise of medical judgment.  *Petties*, 836 F.3d at 729-30; *Norfleet v. Webster,* 439 F.3d 392, 396 (7th Cir. 2006).  "[E]vidence that *some* medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim."  *Petties*, 836 F.3d at 729 (emphasis in original).

    B.    <u>Analysis</u>

The Court addresses each of Rodriguez's medical needs for which he claims Dr. Ahmed provided constitutionally deficient treatment, then it considers his medical needs as a whole.

9

      1.    <u>T2D</u>

No party disputes that Rodriguez's T2D was a serious medical need, so the Court's focus is on whether Dr. Ahmed was deliberately indifferent to that need. Considering all the evidence, the Court concludes he was not.

Since Rodriguez's arrival at FCI-Greenville, the medical staff prescribed him insulin and Metformin, medications he had previously been prescribed for this T2D. Rodriguez requested Invokana from Dr. Ahmed on February 18, 2020, which he had also been given in the past. Dr. Ahmed declined to prescribe it because, in his medical judgment and experience, Invokana was not appropriate for inmates with T2D who did not follow recommendations to reasonably control their carbohydrate intake—what he called non-compliant patients. It appeared to him that Rodriguez was a non-compliant patient because his A1c was high, he had gained approximately fifteen pounds since his intake, and his commissary purchase record indicated he bought a good deal of high-fat and high-salt food. Additionally, although not the deciding factor, rules required that Rodriguez try and fail with a formulary medication before a non-formulary medication like Invokana could be prescribed.

Even if Invokana had been on the drug formulary available to Dr. Ahmed to prescribe, in his medical judgment, insulin was the most effective treatment. It could be more easily adjusted based on an inmate's daily carbohydrate intake, and did not come with the potential negative side effects of Invokana. Consequently, Dr. Ahmed prescribed insulin, Metformin, and glipizide.

Dr. Ahmed's difference of opinion from Rodriguez's prior doctors that Invokana was an appropriate treatment amounts, at the most, to a difference of medical opinion, which cannot support a deliberate indifference medical claim unless the chosen path was blatantly inappropriate. Here, it was not. What is effective outside prison—or even in a jail—is not

necessarily appropriate for a prison inmate, and a prison doctor would be remiss not to understand and account for the effect of a changed environment on the appropriate course of treatment.  Dr. Ahmed appropriately used his professional medical judgment here to select a course of treatment he thought would be effective for Rodriguez in prison.  Dr. Ahmed followed up periodically, adjusted Rodriguez's medication dosages when needed, and encouraged him to eat well, exercise, and lose weight, critical components of managing T2D.  No reasonable jury could find he was deliberately indifferent to Rodriguez's need for treatment of his T2D.

      2.  <u>Scalp Condition (seborrheic dermatitis)</u>

Dr. Ahmed contends Rodriguez's scalp condition is not an objectively serious medical condition required to be addressed under the Eighth Amendment because it is not life-threatening.  However, as noted above, an ailment does not have to be life-threatening to be serious as long as it is serious enough that a physician mandates treatment.  Rodriguez's rash likely meets this standard because his pre-arrest doctors as well as Dr. Ahmed himself thought it needed to be treated.

Nevertheless, no evidence shows Dr. Ahmed was deliberately indifferent.  He approved plans to treat Rodriguez's scalp condition with topical anti-fungal and steroid medications and/or medicated shampoos, and when one treatment did not seem to do much good, he tried another.  When none of them cured the problem, he referred Rodriguez to an outside dermatologist.  Again, he declined Rodriguez's request for his prior treatment—a steroid injection—because, in his medical judgment, it was not the primary treatment for Rodriguez's condition and because he thought the dangers from an injection outweighed any benefit it might bring.  Indeed, in retrospect, it appears the condition was stubborn, and even Rodriguez's pre-arrest doctors were not able to cure it even with a steroid injection.

No reasonable jury could find that Dr. Ahmed consciously disregarded a risk posed by Rodriguez's scalp condition. On the contrary, Dr. Ahmed exercised his medical judgment to try new, appropriate treatments when earlier ones did not work but not to try treatments he thought too risky in light of Rodriguez's health problems. No evidence suggests this was a blatantly inappropriate way of addressing Rodriguez's scalp condition. Dr. Ahmed's failure to land on a "cure" does not render him deliberately indifferent.

### 3. Alleged Hernia

As with Rodriguez's scalp condition, Dr. Ahmed asserts that what Rodriguez believed was a hernia was not an objectively serious medical need. Indeed, Dr. Ahmed and PA Mills examined Rodriguez and determined that his condition was not a hernia but was diastasis rectus which, in his medical judgment, did not require surgery or a visit to an outside specialist. No evidence suggests this assessment shoots wide of the range of acceptable medical judgments. In the absence of a physician's judgment that the condition mandated treatment, it does not amount to an objectively serious medical need.

To the extent Dr. Ahmed and PA Mills may have misdiagnosed Rodriguez's condition and he really did have a hernia, that mistake would constitute negligence, at the most. And negligence cannot support liability for deliberate indifference under the Eighth Amendment.

### 4. Back Pain

Dr. Ahmed again argues that Rodriguez's back pain is not an objectively serious medical need. Even if it were, no evidence suggests Dr. Ahmed was deliberately indifferent to this need. He approved using Tylenol as a substitute for Flexeril, the medication Rodriguez had been taking for pain that began in a truck accident about ten years earlier. In his medical judgment, Dr. Ahmed believed Tylenol was adequate to relieve Rodriguez's pain. Furthermore, he believed

Flexeril was only for short-term use, posed a risk of addiction and abuse, and threatened the security of the institution because inmates were known to sell the pills unlawfully. No reasonable jury could find that Dr. Ahmed disregarded Rodriguez's need for pain medication by prescribing a safer drug he believed would be effective rather that providing the more dangerous drug of Rodriguez's choice. His response was not blatantly inappropriate considering Rodriguez's needs and the circumstances.

     5.    <u>Liver</u>

Dr. Ahmed's response to elevated liver enzymes in Rodriguez's blood test was not deliberate indifference. When he noted the elevated level, he ordered an ultrasound, and that ultrasound identified a condition called fatty liver that had not yet progressed to cirrhosis. Dr. Ahmed advised Rodriguez of the only known way to prevent that progression—modifying his lifestyle to lose weight. The ultrasound revealed no mass lesions on the liver that might be cancer. Rodriguez suggests Dr. Ahmed was deliberately indifferent because he did not send him to a liver specialist. No reasonable jury could come to that conclusion based on the evidence in the file. Dr. Ahmed considered an ultrasound showing no cancer and advised Rodriguez of how to treat fatty liver, the condition he actually had. This is a far cry from disregarding Rodriguez's medical needs.

     6.    <u>Dr. Ahmed's Comments</u>

One final word is warranted here about Dr. Ahmed's February 18, 2020, speculation that Rodriguez could commit suicide to solve his problems. Rodriguez is correct that Dr. Ahmed's suggestion was reprehensible and thoroughly unprofessional. Nevertheless, the uncontroverted evidence reflects that despite such an abhorrent statement by Dr. Ahmed, in fact he continued to exercise his professional medical judgment to treat Rodriguez with the diligence required by the

Eighth Amendment.

February 18, 2020, was not Dr. Ahmed's finest hour. The notes from Rodriguez's visit on that day reflect a very contentious meeting where Rodriguez demanded certain treatments, and Dr. Ahmed repeatedly explained that he would not prescribe those treatments simply because Rodriguez had used them in the past. For example, with respect to Invokana, Dr. Ahmed's notes read:

> I advised patient 5 times about medical care being directed by providers and not by inmates demands and that he will get treatment for what he needs not get what he demands unless its medically indicated; patient would listen to the explanation and then repeat the same demand and start arguing with me and threatening me with his lawyer , law suits etc unless I do as he demands " I want you to give me copies of all my records RIGHT NOW for my lawyer !! " ; " I will get my lawyer to give me invokana !"

Def.'s Resp. Ex. 1 (Doc. 61 at 58). With respect to surgery for the hernia Rodriguez believed he had:

> patient when he excessively strains , has a natural bulge on the center of his stomach ; patient was advised that its natural for people who loose some weight that the muscles on the front part are slightly thinned out e.g. after birth with abdomen of mothers and morbidly obese individuals after losing weight ; patient was advised 4 times about this and was repeatedly advised that its elective and is not usually repaired and he should do abd strengthening exercises ;
>
> patient was repeatedly advised that surgery is not indicated and if he had a laparotomy in past and then the scar would dehisce , ten it would be different and surgery may be indicated if he had problems ; patient would listen and act as if he did not listen to a word I said and start arguing again and again and threatening me again and again

*Id.* With respect to medication for Rodriguez's back pain:

> patient is upset at not getting his regular narcotics while incarcerated
>
> patient demanding long term narcotics for minor aches and pains ;
>
> issuing blanket statements that what ever I will give him for treatment with not work , (without even attempting the treatment )

*Id.* (Doc. 61 at 59).

Even if these notes do not reflect exactly what happened in the visit, it is abundantly clear

14

that Dr. Ahmed was frustrated at Rodriguez, and that came out in his inappropriate comments. However, in light of the care he gave Rodriguez at that visit and throughout his incarceration at FCI-Greenville, no reasonable jury could find those comments were manifested in actual deliberate indifference to any of Rodriguez's serious medical needs. Indeed, as Dr. Ahmed announced he would in his notes from February 18, 2020, he gave Rodriguez "the treatment for what he need[ed]. . . . ." In fact, when viewing Dr. Ahmed's treatment of Rodriguez as a whole, no reasonable jury could find he was deliberately indifferent to any individual medical need or to his collective need for health care.

## IV.    Conclusion

For the foregoing reasons, the Court:

- **GRANTS** Dr. Ahmed's motion for summary judgment (Doc. 60); and
- **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**
**DATED:  May 18, 2023**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**
